IN THE CIRCUIT COURT OF THE THIRD CIRCUIT

STATE OF HAWAII

----------------------------)
ASHLEY I. NARCISO,                ) Civil No.
Individually and as the           ) 16-1-126K (Kona)
Personal Representative of        ) (Other Non-Vehicle Tort)
THE ESTATE OF LAWRENCE S.         )
DEPONTE; SHANE DEPONTE,           )
                                  )
            Plaintiffs,           )
                                  )
      vs.                         )
                                  )
SAARMAN CONSTRUCTION, LTD.;       )
JOHN DOES 1-10; JANE DOES         )
1-10;  DOE CORPORATIONS           )
1-10;  DOE PARTNERSHIPS           )
1-10;  DOE NON-PROFIT             )
ENTITIES 1-10; and DOE            )
GOVERNMENTAL ENTITIES 1-10,)
                                  ) [Caption Continued
            Defendants.           )  On Next Page]
----------------------------)



DEPOSITION OF WALLACE DEPONTE


      Taken on behalf of the Defendant and

Third-Party Plaintiff Saarman Construction, Ltd., at

the Law Offices of Ian L. Mattoch, 65-1279 Kawaihae

Road, Waimea, Hawaii, commencing at 1:10 p.m., on

Tuesday, July 18, 2017, pursuant to Notice.

**EXHIBIT B**

BEFORE:     SHARON H. COSKEY, CSR NO. 359

      Certified Shorthand Reporter


Ralph Rosenberg Court Reporters, Inc.
Ofc: (808)524-2090  courtreporters@hawaii.rr.com

```
                              )
SAARMAN CONSTRUCTION, LTD.,)  [Caption Continuing]
                              )
            Third-Party       )
            Plaintiff,        )
                              )
      vs.                     )
                              )
OCEAN TILE, LLC; JOHN DOES    )
1-10; JANE DOES 1-10; DOE     )
PARTNERSHIPS 1-10; DOE        )
CORPORATIONS 1-10; and DOE    )
ENTITIES 1-10,                )
                              )
            Third-Party       )
            Defendants.       )
                              )
```

APPEARANCES:


For Plaintiffs:

        DANIEL P. KIRLEY, ESQ.
        Law Offices of Ian L. Mattoch
        737 Bishop Street, Suite 1835
        Honolulu, Hawaii  96813


For Defendant and Third-Party Plaintiff Saarman
Construction, Ltd.:

        WESLEY H.H. CHING, ESQ.
        Fukunaga Matayoshi Ching & Kon-Herrera
        1200 Davies Pacific Center
        841 Bishop Street
        Honolulu, Hawaii  96813

        and

        JONATHAN L. ORTIZ, ESQ.
        Ortiz & Katano
        2121 Davies Pacific Center
        841 Bishop Street
        Honolulu, Hawaii  96813


For Third-Party Defendant Ocean Tile, LLC:

        LANCE S. AU, ESQ.
        Sumida Au & Wong, LLLC
        735 Bishop Street, Suite 411
        Honolulu, Hawaii  96813


Also Present:

        Monique DePonte






                        -o0o-

I N D E X

EXAMINATION BY:                                           PAGE

MR. CHING ................................   5

MR. KIRLEY ..............................   76

MR. CHING ...............................   109

MR. KIRLEY ..............................   113

-oOo-

INDEX OF EXHIBITS

                                                         PAGE

Exhibit 24:  Mauna Lani Golf Villas -             27

Actual project schedule for Ocean Tile, LLC,

One Page

-oOo-

(Disclosure Available for Counsel.)

WALLACE DEPONTE,

having been first duly sworn,

testified upon his oath as follows:

DIRECT EXAMINATION

BY MR. CHING:

Q.    Please state your name for the record.

A.    Wallace DePonte.

Q.    Can I call you Wallace?

A.    Yeah.

Q.    Or Mr. DePonte. Wallace, my name is Wesley Ching. I'm here representing Saarman Construction. They've been sued by your brother's estate over the accident that occurred on September 15, 2015, at the project that Ocean Tile had at the Golf Villas at Mauna Lani Resort, okay.

And do you remember that Ocean Tile, LLC had a subcontract with Saarman Construction to do the tile work for that project?

A.    Yes.

Q.    So let me go through the procedure a little bit, and then I'm going to ask you about your personal situation, as we were discussing off the record, so we get that on the record.

Anyway, so we're here to -- we call it a

deposition. It's actually to deposit information to us or provide information to us about what you know or saw or heard about the accident, about this project, about this contract with Saarman, but most of it has to do with the accident, okay.

And so you're doing a really good job, but if you could be sure to pay attention to my question, and if you don't understand it, can you let us know that you don't understand the question?

A.   Yeah.

Q.   And I'll rephrase it until you do understand it.

A.   Okay.

Q.   If you proceed to answer, we're going to assume you do understand the question.

A.   Uh-huh.

Q.   Okay. And if you could respond at separate times from me. So let me finish my question, and then you finish your answer, and I will ask another question. All right?

A.   Uh-huh.

Q.   You need to answer verbally.

A.   Yes.

Q.   Like "yes" or "no" --

A.   Yes.

Q.    When was that?

A.    2005, I think it was.

Q.    You were both doing a job together?

A.    No.  We was working for the same company --

Q.    Which one was that?

A.    -- in the union.  I don't even remember the name.  You know the name?  I don't.

Q.    Where were you doing your work?

A.    In Kona.

Q.    So you were working for the same company in Kona, doing tile work?

A.    Yes.

Q.    And was your wife, Monique who is here next to you, a journeyman as well?

A.    No.  She was a helper at that time.  I was a journeyman.

Q.    How long had you been a journeyman?  Since --

A.    She --

Q.    -- early '80s?

A.    Yeah.

Q.    And did she later become a journeyman?

A.    Yeah.

Q.    When?

A.    She went to the school.

Q.   Do you remember when?

A.   2007, I think.  '7 or '8.

Q.   So your wife talked to us on Friday, and I might refer to some of the things she talked to us about, such as she said that you guys formed Ocean Tile, LLC around March 2010.  Does that sound about right?

A.   Yeah.

Q.   Now, before you formed Ocean Tile, LLC, did you and Monique continue to work together doing tile work for someone else?

A.   Yeah.  For the union.

Q.   For the union?

A.   Yeah.

Q.   And was there a time when you both ended up working on Maui?

A.   For the union, yes.

Q.   So when Ocean Tile, LLC was formed in 2010, were you based in Maui?

A.   Yes.

Q.   How come?

A.   We decided to stay there.

Q.   So you were living in Maui?

A.   Yeah.  The union went slow, so we ended up staying there and opening up my company, because I

have the license.

Q.    So you were based in Maui, but were you -- at some point were you doing jobs on other islands like the Big Island?

A.    Yeah.  We do jobs other islands.

Q.    So was most of your work for Ocean Tile, LLC Maui?

A.    Yes.

Q.    And then when this job came along, the Golf Villas at Mauna Lani Resort, who was involved from Ocean Tile in terms of putting in a bid?

A.    I was.

Q.    You did the bid?

A.    My wife did the bid, but I helped her.

Q.    Okay.  And how did you hear about the job; do you recall?

A.    I don't know if they called us or we called them.

Q.    Your wife's father talked to us this morning and said he gave --

A.    Oh, he gave our name.

Q.    -- your company name to the property -- the resident manager at Golf Villas, this guy -- what was his name?

MR. ORTIZ:  Steve?  No.  Scott?

            MR. CHING:  Michael Bates.

            MR. ORTIZ:  Mike.

BY MR. CHING:

    Q.    Does that sound right?

    A.    Yeah.

    Q.    Anyway, so that's how you guys ended up --

    A.    Getting the job.

    Q.    You put in a bid, and you eventually got
the job?

    A.    Yes.

    Q.    Now, prior to that job, had Ocean Tile, LLC
done any other jobs on the Big Island?

    A.    No.

    Q.    So this was the first one?

    A.    Yeah.  First bid, yeah.

    Q.    So let me show you -- I'm going to show you
some documents.  We will refer to them as exhibit
numbers just so we can keep track of them.  And if
you ever want to refer to them, you can.

          Are you able to, despite your injuries, are
you able to read?

    A.    I can't read that well.

    Q.    Okay.

    A.    Or spell.

    Q.    I'm sorry?

A.    Or spell.

Q.    But is that from injuries from the --

A.    Yeah.

Q.    -- accidents?

A.    Yeah.

Q.    If you could wait until I finish my question, it will be easier for her.

But you can recognize your signature, right?

A.    Yeah.

Q.    Hopefully.  So I'm going to show you Exhibit 12.  And it's the -- what appears to be -- or we produced, my company, as the subcontract between Saarman Construction and Ocean Tile, LLC, dated April 2nd, 2015.

Let me show you page 26.  And you're welcome to look at anything, but page 26, is that your signature there?

A.    Yes.

Q.    Okay.  And is that your license number?

A.    Yes.

Q.    And what is the license number shown?

A.    It's 20 -- 20942.

Q.    And that's your contractor's license number --

A.    Yes.

Q.    -- with the State of Hawaii?

A.    Yes.

Q.    And is it current?

A.    Yes.

Q.    Do you know when it expires?

A.    I think it's sometime this year.

Q.    Do you have it on you?

A.    My wallet, yeah.

Q.    Can you check if you have it and take a look at it?

A.    '16.  Didn't get the other one yet.

Q.    So this is your license 20942 issued by the State of Hawaii, showing an expiration date of 9/30/2016.  You have a renewal license?

A.    Yeah.  It's coming.

Q.    It's coming?

A.    Yeah.

Q.    All right.

A.    Just get all the paperworks together.

Q.    Now, in terms of the subcontract, who was more involved in the contract with Saarman, you or your wife?

A.    My wife.

Q.    Did you, when you signed the subcontract

with Saarman on behalf of Ocean Tile, LLC, expect to perform pursuant to the contract?

A.    Yes.

Q.    And you understood that there was legal duties and obligations on both sides between Saarman and Ocean Tile, LLC as part of the contract?

A.    Yes.

Q.    Ocean Tile provides services in terms of tile installation, and, obviously, there's a payment provision, right?

A.    Payment, yes.

Q.    Now, we also got from your attorney a schedule that apparently was prepared by your wife. We will mark it as the next exhibit in order, 24, and you can put that in front of you.

So what it says on top is "Mauna Lani Golf Villas - Actual project schedule for Ocean Tile, LLC."  You see that?

(Deposition Exhibit 24 marked.)

A.    Yes.

Q.    Did you have a hand in preparing this document or --

A.    No.

Q.    -- was it created by your wife?

A.    My wife.  We both talked about it, but my

wife.

Q. But as far as what's shown on the schedule, and it's basically a schedule of work by building at the Golf Villas, does it look to you to be accurate?

A. No, because sometime they'll change the dates to start. They said they're going to start at a certain date. Then we call them up, and they're not ready. We got to wait for another week or a week and a half, and then they'll call us, and then it's ready. Then we fly over and go do it.

Q. But this says "Actual project schedule." Do you know whether this was the dates that work was actually performed by Ocean Tile --

A. No.

Q. -- or scheduled?

A. No.

Q. No, you don't know?

A. No.

Q. Well, for Building "I" it says September 14. You see that?

A. Yeah.

Q. Does that sound correct?

A. Yes.

Q. Okay. And do you remember the date of the accident being September 16?

A.   Yeah.

Q.   All right.  And that looks to be the seventh building that Ocean Tile worked on at the Golf Villas?

A.   Yeah.

Q.   So for the prior six buildings -- let me ask for Building "I."  The two workers from Ocean Tile were Lawrence DePonte, your brother --

A.   Right.

Q.   -- and Gilbert Ruiz, correct?

A.   Right.

Q.   Nobody else?

A.   No.

Q.   Did Gilbert Ruiz do work for Ocean Tile on any of the prior six buildings?

A.   No.  He did it after.

Q.   After --

A.   When my brother passed away, Gilbert -- I flew over, and Gilbert worked with me over to the next buildings.

Q.   But he was your helper?

A.   Yeah.

Q.   This was his first --

A.   Yes.

Q.   If you could let me finish.

A.   Oh.

Q.   Building "I" was the first job that Gilbert Ruiz worked for Ocean Tile on?

A.   Yes.

Q.   Now, how about your brother Lawrence?

A.   What about him?

Q.   Oh.  Had he worked on any of the prior buildings doing tile work for Ocean Tile before Building "I"?

A.   Yes.

Q.   Do you remember which ones?

A.   The first one we did.  I think it was "N."

THE REPORTER:  "N" like Nancy?

A.   Yeah.  I'm not sure what the first one was. Is it on here?

BY MR. CHING:

Q.   It starts with "K" and "M," and it says "Completed."  I don't know what that means.

A.   Well, you know what?  Maybe it was "K" was the first building we started.

MR. AU:  Are you guessing now or do you know?

THE WITNESS:  I'm not sure.  I'm looking at this, but this shows the 5th, the 6th, July 15, July 29.  I don't know if those dates even

right.

BY MR. CHING:

Q.   Okay.  But does the sequence of the completion of the buildings look correct?

A.   I guess so.

Q.   Okay.  So "K" or "M" was one of the first buildings --

A.   Yeah.

Q.   -- that Ocean Tile did the tile work on?

A.   When we first started.

Q.   Okay.  So my question really is focused on what buildings did Lawrence DePonte work on before Building "I," if you recall?

A.   We -- he started it with me on the first building.

Q.   You and he?

A.   Yes.  And he -- and me and him used to work together on all the buildings until I had to fly back to Maui.

Q.   So when --

A.   Then he would run the job.

Q.   So did he stay on up through the accident?

A.   Yes.

Q.   So did he, Lawrence, work on each of these Buildings "K," "M," "L," "N," "O," "J"?

A.    Yeah.

Q.    Before Building "I"?

A.    Yeah.

Q.    And was he -- he was a journeyman?

A.    Yeah.

Q.    Tile guy, right?

A.    Yeah.

Q.    And was he the working foreman?

A.    Yes.

Q.    So as part of his duties and responsibilities -- well, did he -- when he was working on the job with you, who -- you were the lead guy, right?

A.    Yeah.

Q.    But when he was with somebody else, was he the lead guy?

A.    Yes.

Q.    And in terms of the daily schedule, do you know what kind of job site inspections he would do on a daily basis when he was doing work at the project?

A.    When I wasn't there?

Q.    When you were not there.

A.    When I was not there.

Q.    Let me rephrase the question, okay.

When you were not there -- well, let's

start with when you were there.  Who did the daily job site safety inspections?

A.    I would go.

Q.    And were you doing work on scaffolding for the buildings that you did work on?

A.    I didn't build no scaffolds.

Q.    No.  I'm sorry.  Did you do work on scaffolds?

A.    Yes.

Q.    Okay.  Who put up the scaffolds?

A.    The guys we worked for.

Q.    Saarman?

A.    Saarman.

Q.    So Ocean Tile did not erect --

A.    No.

Q.    -- any scaffolds?

A.    They didn't put up one thing on those scaffolds.

Q.    You're talking about Ocean Tile?

A.    Yeah.  Ocean Tile did not even put anything up.

Q.    As far as the scaffolding?

A.    Yeah.

Q.    Okay.  But did you, when you were working at the job site, did you inspect and observe the

scaffolding before you did work on the scaffold each day?

A.    Yes.

Q.    What were the kinds of things you looked for?

A.    For bracing on the building or how far the thing is away from the scaffold from the building. Those kind of things.

Q.    How about in terms of the connections between the brace and the --

A.    Yeah.  The braces, I go through all the braces, and they wasn't good.

Q.    And what?

A.    They weren't good.

Q.    What do you mean --

A.    And I will --

Q.    -- they weren't good?

A.    -- tell Simon [sic] them that the pin would come off, get loose and would come out, and then the thing would pop out.

Q.    When is the first time you observed that?

A.    Oh, when we first started the job I was telling them that.

Q.    And so did you do any kind of written report about that?

Q.   "He" being Lawrence?

A.   Yeah.

Q.   So you decided to have Lawrence go continue to do the work at the Golf Villas, and you would stay in Maui?

A.   Yeah, and do the work I was doing in Maui.

Q.   And who hired Gilbert Ruiz?

A.   My brother.

Q.   Lawrence hired him?

A.   Yeah.  I told him he can use Gilbert, and he said he's going to call Gilbert up.

Q.   So Gil's first day on the job was September 14, two days before the accident when work was started on Building "I"?

A.   Yes.

Q.   Now, for Building "I," you weren't there then?

A.   No.

Q.   And that meant Lawrence was the working foreman, essentially?

A.   Yes.

Q.   Right.  And he would have been the one to inspect or check on the scaffolding --

A.   Yes.

Q.   -- each morning?  And what was your

practice to do it first thing in the morning when you did it?  When you were working at the job and checking on the scaffolding, would you do it first thing in the morning?

A.   Yeah.

Q.   Because you didn't want to go up on the scaffold --

A.   First thing --

THE REPORTER:  Hold on.  We got to let him finish.  Okay.

THE WITNESS:  Oh.

BY MR. CHING:

Q.   You didn't want to get up on the scaffold if you saw a problem with the scaffold, right?

A.   Yes.

Q.   So is that what you taught Lawrence?

A.   Yes.

Q.   Okay.  So you would have expected Lawrence to have done his inspection of the scaffolding first thing each morning?

A.   Yes.

Q.   So for this Building "I," the accident occurred Wednesday, September 16, 2015.  So you would have expected him to have inspected the scaffolds Monday, September 14, in the morning, correct?

A.    Yes.

Q.    Tuesday, September 15, in the morning?

A.    Yes.

Q.    And Wednesday, September 16, in the morning?

A.    Yes.

Q.    Now, during that time period of those three days before the accident, let's start with Monday, what was his means of communicating with you?

A.    On the phone.

Q.    So how often would he be in touch with you on a workday when he was doing work with Gil at the job site?

A.    All kine times.  He will call me at lunchtime.  Call me -- if he's taking a break, he will call me.

Q.    So several times a day --

A.    Yeah.

Q.    -- or more?

A.    Yeah.

Q.    If you could wait for me to finish the question.

So would he call you first thing in the morning when they were getting to work and starting the job?

A.   Yeah.   He would call me.

Q.   And did he report to you about any problems or concerns he had about the scaffolding on Monday, September 14th?

A.   No.

Q.   Did he report to you about any problems or concerns he had with the scaffolding when he inspected it on Tuesday, September 15?

A.   Tuesday, he told me when -- when I talked to him, he said he had to tell them to redo the tie wires on the braces.

Q.   Did you understand which braces he was referring to?

A.   Yes.

Q.   Which ones?

A.   The cross member brace.

MR. ORTIZ:   I'm sorry?

THE WITNESS:   The cross member.

BY MR. CHING:

Q.   The ones that are in, like, an "X"?

A.   Yes.

Q.   What about the horizontal brace?

A.   We would check those too, but he didn't say nothing about that.

Q.   Yeah.   That's what I'm asking.   On Tuesday

did he say anything about --

A.   No.

Q.   -- the horizontal brace?

A.   No.

Q.   But he did ask them to redo the wires --

A.   Yes.

Q.   -- on the cross bracing?

A.   Yes.

Q.   And I know you know what I'm going to question you about, but if you could just let me finish the question --

A.   Okay.

Q.   -- it will be a better record.

A.   Okay.

Q.   And you may not, but did you make any notes of what he told you, in other words, handwritten notes?

A.   No.

Q.   Did you ask him to do any kind of written report about any of this?

A.   I just told him "Call Frank."

Q.   Do you know if he called Frank --

A.   No.

Q.   -- about that?

A.   No.

Q. But that was the procedure?

A. Yeah.

Q. And Frank was, what, the field supervisor for Saarman?

A. He was the working foreman.

Q. Working foreman?

A. Yeah.

Q. He was under Jaime?

A. Yes.

Q. But he was involved in the field, right?

A. Everything.

Q. Okay. And Wednesday morning, early in the morning before the accident, did he, Lawrence, call you about his inspection of the scaffolding and whether or not he saw any problems or concerns?

A. That's the only one he told me about, was the cross members that they had to tie wire. That was it.

Q. That was Tuesday?

A. Yeah.

Q. So that week for Building "I," that's the only one you remember --

A. Yes.

Q. -- that -- excuse me -- that Lawrence called you about and said that the tie wire needed to

"indemnification" --

A.    No.

Q.    -- before?  Do you agree that Ocean Tile was using the scaffolding that had been erected by Saarman when this accident occurred?

A.    We used the scaffold?

Q.    Yeah.

A.    Yes.

Q.    That Ocean Tile, meaning Gil Ruiz and Lawrence DePonte, were using scaffolding that was provided by Saarman at this Building "I" when the accident occurred?

A.    Yes.

Q.    And did you understand that according to Article 5 -- and you can turn to S248 of Exhibit 12. The very last sentence, "Subcontractor" -- you understood Ocean Tile was a subcontractor, right?

A.    Yes.

Q.    This is the very last sentence of 5.1.3, "Subcontractor accepts any and all of contractor's equipment, materials, labor, supplies, or facilities as furnished."  Do you see that?

A.    I hear you reading 'em.

Q.    Okay.  Did you understand what that meant?

A.    Yeah.

Q.    "As is"?  That the equipment was furnished "as is"?  As furnished?

A.    That part, I don't understand when you say "as is."  So if it's not good for me to go on there, I can't tell them?  I got to fix it myself?

Q.    No.  It just means you've got to be aware of the condition, and if you see a problem, you notify Saarman like you were doing.

A.    Right.

Q.    And --

MR. KIRLEY:  Does it say that there?

MR. AU:  It doesn't say that there. I'm going to object.  It misstates the contract, and now it's calling for speculation.

BY MR. CHING:

Q.    That's what you said you were doing, right?

A.    What?

Q.    If you saw a problem with the scaffolding when you were working at the project, you would call it to the attention of the general contractor?

A.    I would tell Frank.

Q.    Frank?

A.    That's the brother.  That's the work -- he's the working foreman.  Nothing to do with Simon or -- I never did talk to him.  I only talked to the

brother.

Q.   Okay.  But Frank worked for Saarman?

A.   Yeah.  Anything happened with the scaffolds, I would go to him, and he would be the one to fix it.

Q.   And you wouldn't get on the scaffold until he fixed it?

A.   Until he fixed it.

Q.   And that's what you expected Lawrence to do too?

A.   If anything was wrong, yes.

Q.   If he saw a problem, he would notify Frank and wouldn't get on until it was fixed --

A.   Right.

Q.   -- right?

A.   Right.

Q.   By the way, how are you doing?

A.   I'm doing better.

Q.   Okay.  Because, again, you know, if there's a problem, let us know.

And I know this is a sensitive subject, but when were you first notified that an accident occurred at the project involving your brother?

A.   My brother called me up.

Q.   About when that day?

A.    The same day he fell.

Q.    I understand.  But about what time?

A.    I don't really know the time.

Q.    Lunchtime?

A.    Maybe lunchtime.  Maybe little bit after lunchtime.  I don't know.  All I know, he called me.

Q.    Do you know where your brother was when he called you?  In other words, was he at the -- let me clarify to give you some options.

Was he at the job site?  Was he on the way to Gil's house?  Was he at Gil's house?  Do you know where he was?

A.    He was leaving the job site.

Q.    What did he tell you?

A.    He told me he fell.

Q.    So Gil Ruiz said that -- because -- have you seen Gil Ruiz's written statement?

A.    Not...

Q.    Okay.  He provided a written statement the next day, and he said in that written statement, Exhibit 7, "The fall probably took place at 10:35 a.m."

Then he said they tried to -- after they -- Lawrence rested for a while, they resumed work very briefly, then Lawrence wanted to go, so they left to

go to Gil's house.

A.   Right.

Q.   And by about 11:30 or so they got to Gil's house.

So if they were just leaving the job site when your brother called you, it would be 11:00, you know, sometime around there, 11:30?

A.   I don't know.

MR. KIRLEY:   Are you testifying now?

MR. CHING:   No.

BY MR. CHING:

Q.   I'm trying to give you some foundation.

A.   I don't know.  Because I'm working myself too, so I'm, you know.

Q.   So what else did he tell you about his fall?  Did he tell you what height he fell from?

A.   All he told me -- he called me up.  He told me he fell.  I told him, "Did you call them?  Did you let them know at the job site?  Tell them over there. Get an ambulance over there."  He said, no, he's going to try to walk it off.  That's when they went to Gil's house.

When was at Gil's house, I called over there to see what's going on, and I kept telling them to call the ambulance, and they finally called the

ambulance. And then when the ambulance picked him up, he walked in it. From the ambulance to the hospital he passed away.

MR. CHING: So, excuse me, could you read back that last answer?

THE REPORTER: "All he told me -- he called me up. He told me he fell. I told him, 'Did you call them? Did you let them know at the job site? Tell them over there. Get an ambulance over there.' He said, no, he's going to try to walk it off. That's when they went to Gil's house."

"When was at Gil's house, I called over there to see what's going on, and I kept telling them to call the ambulance, and they finally called the ambulance. And then when the ambulance picked him up, he walked in it. From the ambulance to the hospital he passed away."

BY MR. CHING:

Q. So the first thing you told him was to call an ambulance?

A. Yeah.

Q. Did you order him to call an ambulance?

A. Yeah. I told him. I told him, "Stop what you're doing and let them know."

Q. Why didn't he do it?

A.   He's stubborn.

Q.   Did you call 911 for him?

A.   No.

Q.   Did you talk to Gil at that time to tell him to call 911?

A.   I talked to Gil when they got at the house, and I told them -- told him, "Call the ambulance," because he told me he was laying down in the house. I told him, "Call the ambulance.  Just get him in there already."

Q.   Did you speak to Gil at Gil's house?

A.   Yes.

Q.   Did Gil tell you that your brother was having --

A.   Hard time --

Q.   -- seizures --

A.   Hard time breathing.

Q.   -- and weird, fast breathing from noon on?

A.   Well, he told me that when I called them, when I talked to Gil.  That's when I kept telling him, "Just call the ambulance," and they called the ambulance.

Q.   So the company procedure for an accident like this, Ocean Tile's procedure is to call an ambulance, right, when there's an --

A.    Call --

Q.    -- accident --

A.    -- the ambulance and let the --

THE REPORTER:  I'm sorry.  Start that again.

A.    Call the ambulance and let the supe of the -- the contract -- I mean not the contract, but where we're working, let them know.

BY MR. CHING:

Q.    The general contractor?

A.    Yes.

Q.    So that was the proper procedure, which you told him call an ambulance and let the --

A.    Yeah.

Q.    -- job site know?

A.    Yeah.

Q.    And neither of those was done right away --

A.    No.

Q.    -- right?  So when you spoke to Gil at the house, he told you that your brother was having seizures and having a hard time breathing?

A.    Well, he didn't -- he -- he just told me he's getting hard time breathing.  I told him just call the ambulance, and that's when they called the ambulance and picked him up.

Q.   According to the ambulance records, they didn't get called until 4:51 p.m.

A.   I don't know what time it was.

Q.   Which is over six hours after the accident. Do you know why they waited so long to call the ambulance?

A.   That's my brother.  He's hard head.

Q.   So it's really your brother being stubborn about this, you think?

A.   Yeah.  This -- this -- you know, he wanted to try and walk it off and just see.  Maybe this, you know -- but I told him, "Call the ambulance," because he turn 60, "Your body ain't like it used to be." That's the last time I talked to him.

Q.   Well, was that the time when he had just left the job site, or did you talk to --

A.   No.  I talked to him before he -- before he went in the ambulance.

Q.   You did talk to him before he went in the ambulance?

A.   Yeah.

Q.   While he was at Gil's house?

A.   Yeah.

Q.   But you also spoke to Gil?

A.   Yeah.

Q.    And Gil reported the hard time breathing?

A.    Yeah.

Q.    And then when you last spoke to your brother, about when was that before he went by ambulance; do you know?

A.    No.  All I know, when I called there, I told him call the ambulance, because he's having -- they was telling me having a hard time breathe.  I told them call the ambulance and get him on there, and that's the last.

Q.    Did your brother tell you in either of the -- well, strike that.

When Lawrence and Gil were at Gil's house, did either of them tell you that your brother was having "seizures or something"?

A.    It wasn't seizures.  It was having a hard time breathe.

Q.    I'm saying in addition to the hard time breathing, did either of them report seizures?

MR. KIRLEY:  Asked and answered.

MR. AU:  Asked and answered several times.  You can answer it one more time.  The next time I'm going to say it's harassment.

A.    That -- there was nothing about seizures.  It was hard time breathe.  That's all I remember.  I

mean, if they did, they did. I didn't -- the only thing I heard is breathing, and I told them just call the ambulance.

BY MR. CHING:

Q.    What's the next thing you heard after he left by ambulance?

A.    He passed away.

Q.    Who did you find that out from?

A.    Through my wife.

Q.    And do you know how she found out?

A.    Through Gil, huh? I don't know.

Q.    You're not sure?

A.    No.

Q.    Did you ever notify Saarman that day about the accident?

A.    No.

Q.    Did your wife, to your knowledge, notify Saarman?

A.    I think -- I think -- I think she did. Did that whatever -- I was gone already. I didn't know nothing.

Q.    What do you mean you were gone?

A.    I just was crying and couldn't even believe it.

Q.    You were on Maui with your wife, right?

C E R T I F I C A T E

STATE OF HAWAII                    )

                                   )  SS.

CITY AND COUNTY OF HONOLULU   )


I, SHARON H. COSKEY, do hereby certify:

That on July 18, 2017, at 1:10 p.m. appeared before me WALLACE DEPONTE, the witness whose 117-page deposition is contained herein; that prior to being examined he was by me duly sworn or affirmed pursuant to Act 110 of the 2010 Session of the Hawaii State Legislature; that the deposition was taken down by me in machine shorthand and was thereafter reduced to typewritten form under my supervision; that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter; that pursuant to Rule 30(e) of the Hawaii Rules of Civil Procedure, a request for an opportunity to review and make changes to this transcript was made by the deponent or a party prior to the completion of the deposition.

I further certify that I am not an attorney for any of the parties hereto, nor in any way concerned with the cause.

DATED this 2nd day of August, 2017, in Honolulu, Hawaii.


_____
SHARON H. COSKEY, CSR NO. 359