IN THE CIRCUIT COURT OF THE THIRD CIRCUIT

STATE OF HAWAII

---------------------------)
ASHLEY I. NARCISO,          ) Civil No.
Individually and as the     ) 16-1-126K (Kona)
Personal Representative of  ) (Other Non-Vehicle Tort)
THE ESTATE OF LAWRENCE S.   )
DEPONTE; SHANE DEPONTE,     )
                            )
              Plaintiffs,   )
                            )
       vs.                  )
                            )
SAARMAN CONSTRUCTION, LTD.; )
JOHN DOES 1-10; JANE DOES   )
1-10; DOE CORPORATIONS      )
1-10; DOE PARTNERSHIPS      )
1-10; DOE NON-PROFIT        )
ENTITIES 1-10; and DOE      )
GOVERNMENTAL ENTITIES 1-10, )
                            ) [Caption Continued
              Defendants.   ) On Next Page]
---------------------------)


DEPOSITION OF GILBERT G. RUIZ


        Taken on behalf of the Defendant and

Third-Party Plaintiff Saarman Construction, Ltd., at

the Law Offices of Ian L. Mattoch, 65-1279 Kawaihae

Road, Waimea, Hawaii, commencing at 9:14 a.m., on

Friday, July 14, 2017, pursuant to Notice.

**EXHIBIT** _C_

BEFORE:      SHARON H. COSKEY, CSR NO. 359

             Certified Shorthand Reporter


Ralph Rosenberg Court Reporters, Inc.
Ofc: (808)524-2090  courtreporters@hawaii.rr.com

```
---------------------------)
SAARMAN CONSTRUCTION, LTD.,)  [Caption Continuing]
                           )
          Third-Party      )
          Plaintiff,       )
                           )
     vs.                   )
                           )
OCEAN TILE, LLC; JOHN DOES )
1-10; JANE DOES 1-10; DOE  )
PARTNERSHIPS 1-10; DOE     )
CORPORATIONS 1-10; and DOE )
ENTITIES 1-10,             )
                           )
          Third-Party      )
          Defendants.      )
---------------------------)
```

APPEARANCES:


For Plaintiffs:

        DANIEL P. KIRLEY, ESQ.
        Law Offices of Ian L. Mattoch
        737 Bishop Street, Suite 1835
        Honolulu, Hawaii  96813


For Defendant and Third-Party Plaintiff Saarman
Construction, Ltd.:

        WESLEY H.H. CHING, ESQ.
        Fukunaga Matayoshi Ching & Kon-Herrera
        1200 Davies Pacific Center
        841 Bishop Street
        Honolulu, Hawaii  96813

        and

        JONATHAN L. ORTIZ, ESQ.
        Ortiz & Katano
        2121 Davies Pacific Center
        841 Bishop Street
        Honolulu, Hawaii  96813


For Third-Party Defendant Ocean Tile, LLC:

        LANCE S. AU, ESQ.
        Sumida Au & Wong, LLLC
        735 Bishop Street, Suite 411
        Honolulu, Hawaii  96813









                              -o0o-

                              I N D E X

EXAMINATION BY:                                        PAGE

      MR. CHING .................................         5

      MR. KIRLEY ...............................       119

      MR. AU  ..................................       165

      MR. CHING ................................       166

      MR. ORTIZ ................................       174


                       INDEX OF EXHIBITS

                                                      PAGE

Exhibit 1:    Diagram (S000292)                        30

Exhibit 2:    Diagram (S000291)                        31

Exhibit 3:    Color Xerox Photo                        59

Exhibit 4:    Color Xerox Photo                        59

Exhibit 5:    Color Xerox Photo                        59

Exhibit 6:    Color Xerox Photo                        59

Exhibit 7:    9/17/15 Handwritten Statement            85

    (S000287 - S000288)

Exhibit 8:    Video Produced to Court                 177

    Reporter After Completion of Deposition

Exhibit 9:    Daily Scaffold Checklist,               135

    One Page

Exhibit 10:   Batchelder Statement, Three Pages       160

Exhibit 11:   Hawaii EMS Report, Four Pages           169

                         -o0o-

(Disclosure Available for Counsel.)

GILBERT G. RUIZ,

having been first duly sworn,

testified upon his oath as follows:

DIRECT EXAMINATION

BY MR. CHING:

Q.   Please state your name for the record.

A.   Gilbert G. Ruiz.

Q.   What's your residence address?

A.   73-4405 Punawele Street, Kailua-Kona, Hawaii, 96740.

Q.   And how long have you been living there?

A.   I've been living in Kona since 1996.

Q.   Who do you live there with?

A.   My wife and my three children.  Well, they're adults.  Young adults.

Q.   Okay.  Have you had your deposition taken before, a proceeding like this?

A.   No, never.

Q.   So we're taking what is called a deposition where we ask questions of you as a witness about this accident that involved a Lawrence DePonte, September 16, 2015.  You understand there's a lawsuit that's been filed by --

A.   Yes --

A.    -- well --

Q.    -- buckets?

A.    -- I could have been.  I could have been, because, basically, I'd send up a bucket of cement. He's laying tile.  And if I'm close to him, then I will hand him the tile as he needs it, and then he would put the mud on the back of the tile.

Prior -- I mean after that, then I learned to pre-mud it for them, but that couple days I was learning.  So all I was doing was handing him tiles, and when they look like he was going to need more mud, I would get off the scaffold and have another bucket ready.

So when he was ready, he'd throw the bucket on the floor.  That was my chief note to say, okay, he's ready for the next bucket.  So I just had to stay ahead of him.

Q.    Had you performed tile work in a construction setting before?

A.    No.

Q.    You did some on your own, you said, some tile?

A.    I tiled my -- my own, yes.

Q.    But you never worked as a -- in construction as a tile installer?

A.    No.

Q.    And you were basically assisting Lawrence that day -- or that week?

A.    I was the laborer, yes.

Q.    Did you have any training by Ocean Tile before you started this job for the work --

A.    Yeah.

Q.    -- you were --

A.    He told me how he wanted me to mix the mud. That's all it was.

Q.    I meant before the project started, was there training by Ocean Tile for you?

A.    As far as what kind of training?

Q.    Training on tile work.

A.    No, because Wallace had came to my house, and he saw that I tiled my bathroom, and he says, "Okay, he knows enough to be a helper."

Q.    And what about in terms of, you know, for that first week before the accident, did Ocean Tile have any kind of job safety meeting?

A.    They had -- well, as far as a safety meeting, we -- we basically talked to each other, you know.  I mean, there was no -- there -- we didn't have a toolbox meeting like --

Q.    That's --

went -- when Lawrence was doing the tiling of the closet, was anyone else using the scaffold?

A.    No.    Everybody was out.    It was our turn to go in.    So everybody stays off.    We don't get in their face.    They don't get in our face.    So they finished their work.    Then it was our time to come in.

Q.    Same thing on Wednesday, the day of the accident?

A.    Yes.

Q.    Ocean Tile was using that scaffold?

A.    Yes.

Q.    So do you recall approximately what time the accident occurred?

A.    I think it was about 10:30 in the morning.

Q.    So what I want to focus on is the time from when you started work to before the -- just before the accident.    What did you and Lawrence do before the accident that morning?

A.    I was mixing cement, and he was laying tile, and then the accident happened.

Q.    So was there any discussion with any other contractor or subcontractor before the accident that morning?

A.    I do not recall.    Maybe if somebody came by

and we said "Good morning."  Other than that, there was no talking to anybody.  We were there to do our job.

Q.    So nobody came to talk more substantively other than pleasantries of "Good morning"?

A.    No.

Q.    Did you know anybody else that was doing work at this project besides Lawrence?

A.    No.

Q.    And Lawrence, he -- he is Wallace's brother?

A.    Yes.

Q.    And you know -- let's see.

How are you related to Monique?  I mean --

A.    Monique -- Monique is married to Wallace. Wallace is my wife's first cousin, and Lawrence is Wallace's brother.

Q.    So it's your wife that's --

A.    First, yes --

Q.    -- first cousin of Wallace?

THE REPORTER:  Let him finish.

BY MR. CHING:

Q.    It's your wife that is the first cousin of Wallace?

A.    Yes.

Q.   And Wallace is brothers with Lawrence and married to Monique, correct?

A.   Yes.

MR. KIRLEY:   Got that?

MR. ORTIZ:   Make a chart.

BY MR. CHING:

Q.   Can you think of anything else of consequence that occurred that morning before the accident that you haven't already discussed with us?

A.   No.

Q.   Where were you staying the night before, for example?   At home?

A.   Yes.

Q.   Were you driving to the job separately from Lawrence?

A.   No.   I drove with Lawrence to the job site.

Q.   How did you guys get together?   Wasn't he staying with his daughter?

A.   Yes.

Q.   So how did you guys carpool?

A.   He picked me up.

Q.   Oh, he picked you up?

A.   Yeah.

Q.   So he drove down to Kailua-Kona?

A.   His daughter lives in Kailua-Kona.

Q.   Okay, okay.

A.   I also live in Kailua-Kona.

Q.   Okay.  I forgot where she lived.

So he picked you up, and then you guys went to the job?

A.   Yes.

Q.   So what was the first you heard or saw that indicated to you there might have been an accident?

A.   I heard him screaming when he was going straight down to the floor, and I looked up and I seen him.

Q.   When you saw him -- so where were you?

A.   I was about 8 feet away from him --

Q.   On the ground?

A.   -- mixing a bucket of mortar.

Q.   And when you -- you heard him screaming, so you looked up?

A.   Yes.

Q.   And if you're facing the lanai from the outside in the makai area, approximately where were you in relation to the scaffold?

A.   Eight feet away.

Q.   Why don't you indicate with a colored pen approximately where you were.  Just put a dot or something to indicate approximately -- you see where

Q.   And we don't see the grass on --

A.   No.

Q.   -- the bottom of Exhibit 4.  So tell us what you did right after you saw him land on the ground -- on the lanai.

A.   I let go of the drill.  I ran up to him, and I said, "Lay down.  Stay down."  And he says -- he sat up.  He was -- he needed to catch his breath.  He was like (indicating).  And then he sat up, and he was able to catch his breath.

While he was sitting there catching his breath, that's when the two painter guys -- or whoever it was -- came running out and said, "Is everybody okay?"  And he said, "Yes, I'm fine."

So he sat there.  He took 10, 15 minutes to regroup, and then he told me to go ahead and finish mixing that cement and put it up on top of the scaffold, because he was going to go back to work.

So he got back up on top of the scaffold, but he couldn't -- he couldn't carry the bucket because it was too heavy, because his shoulder was sore.  So he had me go up to the scaffold, and I held the bucket for him as he's getting cement to lay for the tile, okay.

This is -- okay.  Now -- now the picture is

coming closer, because he didn't have to lay the thinset too far.  He was already close to the edge with the tile.

Q.    The makai edge of the lanai?

A.    Yes, because we were standing on top of the scaffold as he was laying the thinset, and I'm holding the bucket, he's getting thinset, laying on the ground to lay the tile.

He laid one, two tiles, and he said he couldn't do it anymore.  He was sore.  So that's when I told him, "Okay, let's go to the doctor."  And he didn't want to go.

Q.    Did you or he notify anybody at the job site about this incident?

A.    I tried to, and he said no.  He just wanted to go and -- we didn't think it was that bad.

Q.    The two painters, where did they come from?

A.    They were painting someplace in the next condo next -- which is the one next door.  They came out from the floor --

Q.    Do you --

A.    -- the bottom floor.

Q.    Do you mean the same building or --

A.    The same --

Q.    -- different --

A.   -- building.  The next door over.

MR. KIRLEY:  You guys are talking over each other.

BY MR. CHING:

Q.   So in the same building but a different unit?

A.   Yes.

Q.   And did anybody else come by before you guys went back to work?

A.   No.

Q.   So about how long did you and Lawrence resume work before he said he can't continue?

A.   Ten minutes.

Q.   Did you -- did he lay any tile?  Two?

A.   Maybe two.

Q.   Was there any more to be done for that lanai?

A.   Yes.  There was a lot of work.  That was the very beginning of the project.  We had 22 --

Q.   Oh, I meant --

A.   -- buildings.

Q.   I meant for that lanai when you stopped work that day because he didn't want to continue, was there any more tile to be laid on that lanai, second floor Unit I-1?

A.    Yes.  The lanai was not completed.

Q.    Thank you.  That was my question.

So did you have a cell phone?

A.    Yes.

Q.    Did you call anyone at Ocean Tile about this right after the accident?

A.    We tried -- no, no.  He -- he didn't want to call nobody.  He didn't want to go to the doctor. I told him, "Let's go report this to the general contractor," and I guess he was in shock or something, I don't know, because he didn't want to approach anybody.  So I took him.  We went to my house, and at my house he took a shower.

Q.    You went to your house?

A.    Yes.

Q.    Okay.  But during this process did you call Wallace --

A.    Yes.

Q.    -- or -- you did?

A.    We called Wallace, and Wallace told him "Go to the doctor."  He didn't want to go to the doctor. He didn't think it was that...

Q.    Where were you guys when you called Wallace?

A.    We were at my home.  We just reached my

house.

Q.   And you reported this incident to Wallace?

A.   Yes.

Q.   Were you the one that was doing the talking to Wallace?

A.   No.   Lawrence was talking to Wallace.

Q.   Oh, okay.

A.   Lawrence was fine.   He was -- he was sitting there fine.   He went inside the house, took a shower, came back out in the garage, and he was fine.

Q.   Okay.   But in terms of the phone call with Wallace, what did you hear him tell Wallace?

A.   That he was pissed because he fell off the scaffold.   The brace didn't hold.   So the brace gave. He fell off.   So he was upset because he got hurt, and he shouldn't have gotten hurt.

Q.   But was there any discussion, do you know, about going to the doctor?

A.   Wallace told him "Go to the doctor."

Q.   Did he?

A.   And he -- he refused.   After a while he was in my home, and it looked like he was going in and out of shock.   So I would treat him, you know.   I would treat him for shock, you know, but he was incoherent the whole time.   He was talking to me the

whole time.

Q.    He was incoherent?

A.    I'm sorry.  That's the wrong word.

He was -- he was -- he was talking to me as if nothing was wrong.  He was just sore, his shoulder.  All he was complaining was his shoulder was sore.

Q.    His left shoulder?

A.    His left shoulder.  That's his only complaint, was his left shoulder was sore, and he thought it was just sore.  So I put an ice pack on him, and I tried to take him, tell him, "Hey, let's go.  Let me call somebody."

After one particular time that he went into shock, it looked like he went into shock, he scared me.

Q.    When was that, approximately --

A.    This was about --

Q.    -- time-wise?

A.    -- about 3:30, four o'clock in the afternoon now.

Q.    What time did you guys get to your house?

A.    11:30.

Q.    So within an hour of the fall?

A.    I'm 40 minutes from the job site, and we

worked maybe 10, 15 minutes after the fall.  So that puts me at my home approximately one hour after the accident.

Q.    So around 11:30?

A.    Yes.

Q.    And what time did you call or he called Wallace?

A.    We called Wallace right as soon as we reached my house.

Q.    Okay.  And then at what point in time was it where he seemed to be going into shock?

A.    It was about 2:30, three o'clock.  And at one point it was -- he just got really physical.  So I told him that he was scaring me; I didn't want nothing to happen to him in my home; that I had no control over it as far as helping him.

That convinced him.  So we called the paramedics.  The paramedics came to my home.  They brought the gurney, sat it in the living room, and they talked to Lawrence for 10 minutes, and they told Lawrence that if he doesn't want to go to the doctor, he doesn't have to, but if he wants to go to the doctor, he needs to stand up on his own and sit in that gurney, and he did.  He stood up on his own, sat in the gurney, and they left.

Q.    Okay.

A.    He never made it to the hospital.

Q.    You didn't go with him to --

A.    No.

Q.    -- the hospital?  What do you mean by "he got real physical"?

A.    Well, it just looked like he -- he went into shock, and his body just (indicating), you know. He -- so I just held him down, basically.  I held him down --

Q.    So --

A.    -- then he got out of it.

Q.    Excuse me.  That wasn't normal, right?

A.    No, that was not normal.

Q.    And how soon after that did you or he call 911?

A.    Right afterwards.  I told him, I said, you know, "This is not right.  This is not how it's supposed to be happening.  So we need to call somebody, because you are scaring me, and I don't want you dying in my home."

That's how it all came down, and that's what convinced him to call the doctor.  Then he knew something might have been wrong.

Q.    So who called, what, 911?

A.    Yes.

Q.    He did or you did?

A.    No.  I did.

Q.    And they got there, and then they examined him there?

A.    Yes.

Q.    And you described their discussion with him about --

A.    Yes.

Q.    -- he didn't have to go, but if he did, he had to get on the gurney?

A.    Yes.

Q.    And then they took him out into the ambulance and left?

A.    Yes.

Q.    Did anyone go with him from the family?

A.    No.

Q.    Well, who was at home during this time?

A.    My son showed up at home, and he was with me through that ordeal for the last three hours.  He was with me.

Q.    About what time did he leave --

A.    He got --

Q.    Excuse me.  What time did he leave by ambulance?

You know what?  I'll look at the ambulance report.

A.    Yeah.

Q.    I thought I had it, but I don't.

Do you remember about what time he left by ambulance?

A.    Approximately -- I'm not too sure, but I'm thinking it was right around 4:00, 4:30.

Q.    And what's the next thing you heard about Lawrence after that?

A.    My daughter calls me up on the phone, crying that Lawrence had passed away.

Q.    Your daughter?

A.    My daughter calls me on the phone, because Wallace's granddaughter -- or Lawrence's daughter called Wallace's granddaughter and told her that her dad had passed.  She was at the hospital, waiting for her father to get there, and he never made it there alive.

Q.    So Wallace's daughter is Ashley?

A.    Ashley.

Q.    And she called who?

A.    She called her cousin, and her cousin called my daughter, and my daughter tells me "What happened to uncle?" because everybody says I was with

him.  So I explained to her what happened, and that's when I find out he had passed.

Q.    And that's from your daughter?

A.    From my daughter.

Q.    What's her --

A.    Her name is Mercedes.

Q.    And she found out from Ashley calling --

A.    Ashley --

Q.    -- her cousin?

A.    Her cousin, yes.

Q.    And how is your daughter related to the cousin?

A.    Ashley is Lawrence's daughter.

Q.    Yes.

A.    The cousin is Wallace's granddaughter.

Q.    Confusing.  Okay.

A.    And they're all about the same age, 21, 22, so.

Q.    And Mercedes was about the same age?

A.    Yeah.

Q.    So they knew each other?

A.    Yes.

Q.    And Mercedes called you, and that's how you first found out that --

A.    That's how I first found out, yes.

Q.   -- that Lawrence had passed?

A.   Yes.   And I told her, "That's not true, because he left here in the ambulance," and I was denying it.

And prior to that Ashley called me on the phone and asked me where was her dad, and I told her he left.   It was approximately about 4:30.   This is about an hour later.   She's asking, "Where's my dad? Where's my dad?"

And when the ambulance arrived at the hospital, I heard her yelling out, "Is that Lawrence DePonte?"   And that's it, the phone went off, but because of the fact that when they brought him out of the ambulance, he was covered.

Q.   But you weren't there at the --

A.   No.

Q.   -- hospital?   And they took him to Kona Hospital?

A.   Kona Community, yes.

Q.   Who else did you speak to that day, September 16, 2015, about this situation after that?

A.   Well, my wife.   My wife was at home, and -- who else?   They were going to the Mainland.   They were going to a wedding.   My wife and one of my sons were going to a wedding in the Mainland, so they were

at home when we -- when we arrived at home at 11:30.

Q.    So your wife and your son --

A.    My wife got to see her cousin --

Q.    Sorry.

A.    -- before, you know, and -- and we thought that it was just a sore shoulder, because she even told him "Go to the doctor," and he didn't want to.

      But she saw him, and before she got to Los Angeles, he had already passed.  So I had to tell her that when she arrived in Los Angeles.

Q.    So she left that day?

A.    She left that morning.  She left one hour after we arrived at home.

Q.    I see.  Was anybody else at home besides your wife and your son?

A.    Just my -- it was two sons.  I mean, at that time it was just one son.  My wife and my son left to the Mainland, and then my other son came home from work.

Q.    Okay.  So --

A.    And that's when me and my son dealt with Lawrence going in and out --

      MR. ORTIZ:  Do you have --

A.    -- of shock.

      MR. ORTIZ:  -- names of these people?

BY MR. CHING:

Q.    Give us the name of the son that left with your wife.

A.    Shane.

Q.    And the son that came home?

A.    Kenneth.

Q.    And he stayed there until Lawrence left by ambulance?

A.    Yes.

Q.    Was anybody else at your house besides the people you mentioned --

A.    No.

Q.    -- while Lawrence was there?

A.    No.

Q.    And did you have any other contact with Wallace or Monique while Lawrence was at your house?

A.    No.  We just talked to Wallace that one time.  And then the next time I talked to Wallace was to call him to confirm if Lawrence had passed, because I wasn't sure what had happened, only from the phone call I got from my daughter.

So I called Wallace.  Monique answered the phone.  And I could hear Wallace in the background crying.  So I knew it was true.

Q.    That was that evening?

A.    Yes.

Q.    How long after you spoke to your daughter?

A.    Within an hour, I would say.

Q.    And were -- to your knowledge, were Wallace and Monique on Maui?

A.    Yes.

Q.    So did you actually speak to Wallace or just Monique?

A.    Just Monique.

Q.    And what did she tell you?

A.    That it was true that he passed.

Q.    So what else did you do that day of the accident other than what you've already told us?  Did you go to the hospital at all?

A.    I didn't go nowhere.  I was sitting there just taking it all in.  Freaked me out.  Freaked me out big time.

Q.    Did you speak to Ashley that day?

A.    I didn't speak to Ashley for a few days after that.

Q.    I mean after -- you said she called you?

A.    When I spoke to Ashley was when her father arrived at the hospital.  That's the only time I talked to her.

Q.    And you didn't speak to her again for a

couple days?

A.   I didn't speak to her for a long time.  I didn't know what to tell her.

Q.   Is there anything else that happened that day that has to do with Lawrence and this whole situation other than what you've already described?

A.   No.

Q.   After the accident?

A.   No.  It's -- what I said is actually what happened.  We went home, and he started going in and -- I don't know if it was shock or what, but, you know, his hands were curling in like he was having a seizure or something.  So that's when I just, you know, I would just calm him down, and he would settle down, and then he would be fine.

He talked to us, and in about two, three, four, five minutes later he goes, "Oh, it's coming back again," and then he -- his body would start tensing.  So I would relax him (indicating) and then massage his shoulders and stuff, and then he'd come out of it.  It's, like, I didn't know what was going on.

Q.   When was the first time he started exhibiting those symptoms, his hands curling?

A.   This was later on in the afternoon.  After

we went inside the house.  About three o'clock.  From about 3:00 to 4:30 is when it was -- when it all happened, and that's when we called the paramedics.

Q.    Where he was showing symptoms that --

A.    Yes.

Q.    -- were abnormal?

A.    Yes.

Q.    And you finally got him to call 911?

A.    Yes.

Q.    Or you called?

A.    I called.

Q.    Do you know what Ocean Tile's procedures were for reporting an accident in terms of their company policy?

A.    No, I don't.

Q.    I understand you just started a couple days earlier, but did you -- did Wallace, when he -- did you speak to Wallace when Lawrence called him after you got to your house?

A.    I spoke to him, and I told him that Lawrence didn't want to go to the doctor, and he goes, "Yes, I know.  That's how he is.  He's a hard head, and he's probably not going to go to the doctor, but just try to convince him."  That's what Wallace told me, and that's what I tried to do.

A.   Yeah.   They wanted me to tell how everything went down --

Q.   And --

A.   -- so I wrote it down.

Q.   I understand, but you hand wrote it yourself or did the Saarman --

A.   You know what --

Q.   -- person write --

THE REPORTER:  Hold on, hold on, hold on.  Let him finish.

BY MR. CHING:

Q.   Let me finish the question.

Did you hand write the statement yourself or did someone hand write it for you?

A.   No.  I believe someone wrote it.  I spoke to him.  He wrote it.  And, basically, I double checked everything he wrote down, which was Jamie, I believe.

THE REPORTER:  "Which was" what?

THE WITNESS:  Hai-may (phonetics) was the guy from SRS.

THE REPORTER:  Hai-may?

THE WITNESS:  Jaime.

THE REPORTER:  Jaime?

THE WITNESS:  Yeah.

BY MR. CHING:

Q.   Medina?

A.   I think that's his last name.

Q.   Yeah, Medina.

A.   Yeah.

Q.   But Jamie is his first name?

A.   Yeah.  In Spanish you say Hai-may.

MR. KIRLEY:  Is SRS Saarman?

THE WITNESS:  Saarman, yes.

MR. ORTIZ:  Wes, can I ask a clarification?

MR. CHING:  Yeah.

MR. ORTIZ:  After you told the fellow, Jaime, what happened, you reviewed it.  Did you sign it?

THE WITNESS:  I can't recall, but I -- I would think I did.  I can't recall.

MR. ORTIZ:  And you never were given a copy of that?

THE WITNESS:  No.

BY MR. CHING:

Q.   Okay.  This is the day after the accident, right?

A.   Yes.

Q.   So I'm going to -- we will make copies

later, but this is a statement that Jaime, J-a-i-m-e,
apparently wrote in your presence, or you wrote -- or
you spoke and he wrote down, but tell me if you
recognize this.  And we will mark it as an exhibit if
that's what you're referring to.

A.   Yes.

Q.   Is this the statement you gave --

A.   Yes.

Q.   -- to Jaime and where -- let's see --
Patrick Batchelder and you and Jaime were present,
and the meeting took place in front of those people?

A.   Yes.

MR. CHING:  Okay.  So we will mark
this as Exhibit 7.  Make copies later.  And it's
Bates stamped S287 and 288 from Saarman's production.
(Deposition Exhibit 7 marked.)

BY MR. CHING:

Q.   Now, did you get a chance to read this --

A.   Yeah, I read it.

Q.   -- through?  Did you see any changes that
needed to be made in terms of the accuracy of the
statement?

A.   No.  That is accurate as accurate can be.

Q.   When you gave the statement that morning --
and it looks like the date is 9/17/15, the day after,

at 8:42 a.m. -- did you have a chance to read it over then?

A.   No, because at the time that I was saying it, he was writing it, and I was watching him do it the entire time.

Q.   I see.  But in reading it now, it appears to be --

A.   Correct.

Q.   -- accurate?

A.   Yes.

Q.   And the first thing that brought your attention to this accident was you hearing --

A.   Him scream.

Q.   -- him screaming?

A.   Well, it wasn't a scream.  It was just a, just (indicating), you know, because he made noise coming down.

Q.   Well, what this statement says is, "As Gilbert was mixing thinset mud for the tile, he heard Lawrence fall"?

A.   Yeah.

Q.   So --

A.   Fall, scream.  He made -- it was noise, because the -- the brace came and hit, and all of a sudden you hear the bunch of noise.  Could have been

A.   I can't recall if he was checking it for any purpose or what.  I don't know.

Q.   After the accident when you, you know, a couple months later you said you guys returned to work?

A.   Yes.

Q.   And you worked with Wallace?

A.   Yes.

Q.   Do you remember that from then on you and Wallace had to access the lanais -- the second floor lanais from the interior?

A.   We never entered any homes.  We never.

Q.   So even after you don't remember using the interior to get to the lanais?

A.   On our very last building, we used the interior the last couple days.  Other than that, we never walked through any house.  Everything was done from the outside.

MR. CHING:  So I'm going to mark this as the next exhibit in order.

(Deposition Exhibit 11 marked.)

BY MR. CHING:

Q.   And it's the EMS report that I was looking for earlier.  So it looks like, and I will show this to you, it looks like 911 was called at -- I can't

read this -- 4:51?

A.   Probably.

Q.   And then arrived at scene 5:00 p.m.  Does that sound about right?

A.   Yeah, because the paramedics are not too far.  They're maybe only five, six minutes away.

Q.   And then departed scene 5:20.  So they were at your house 20 minutes?

A.   Yeah.  Because they talked to him.  They talked to him first and...

Q.   And then they actually didn't get to Kona Hospital until 6:01.  So it's 40 minutes?

A.   If there's traffic, but --

Q.   Anyway, that's what it shows on the report.

A.   Yeah, it shows -- it shouldn't have been 40 minutes, though.

Q.   So what it does indicate in terms of the narrative that was prepared by the EMS attendants, it says, and I can show you this, "At 1200 hours friends state patient began having 'weird fast breathing' and 'seizures or something man,' and throughout the afternoon patient continued to have similar type symptoms intermittently."  So do you recall that --

A.   Yeah.

Q.   -- from noon on he was having these -- the

weird fast breathing and seizures?

A.    He was, like I said, he was sitting there -- we were sitting in the garage for a little while, and then he said he wanted to go take a shower.  So he went inside.  He took a shower.  He came back out.  I gave him some water.  I gave him some bread.

And he wanted to go rest.  So we went inside the house.  He sat in the living room, and he looked like he would -- started nod out.  And then I felt that he shouldn't have gone to bed because it was after a fall, so I basically kept him up.

And then he would feel like, you know, like he's getting dizzy, or he tell me, "Gil, it's happening again."  I don't know what was happening, but it was like he was having some kind of attack or something.  I don't know what it was, but his arms were curling into his -- it gave me the impression he was getting a seizure or something like that, but I don't know what it was.  So I would just keep him relaxed, and then all of a sudden he'd come out of it.

Because I had family that were epileptic, and that's what we'd have to do, keep them calm.  That's basically what I done.  I kept him calm, and

he'd come out of it. And he said, "Okay, Gilbert. Thank you. I'm fine, I'm fine," and five minutes later, 10 minutes later, he'd do it again, and I was there just to, you know.

Q. But he had the previous trauma of having fallen to the ground, you know, that morning?

A. Right.

Q. So it wasn't until, according to this EMS report, Exhibit 11, 4:51, almost five hours later that 911 was called?

A. Yes.

Q. And that sounds reasonably accurate in terms of the times that --

A. Yes.

Q. -- I just read you?

A. Yes.

Q. Do you know what Humberto's position was with Saarman?

A. I don't know what his position was. I'm assuming he was, like, a superintendent, because he would tell other employees what to do.

Q. So he was a supervisor?

A. Supervisor, maybe, yeah.

Q. But he wasn't one of the Medina brothers?

A. No, he was not one of the brothers.

Q.   Do you know how long the scaffolding that was outside Unit I-1 was in place before you guys got there?

A.   I have no idea.

Q.   Thank you.

A.   I don't know.

MR. CHING:   Nothing further.

MR. ORTIZ:   Finished?   Can I clarify one question?

MR. KIRLEY:   Yes.

CROSS EXAMINATION

BY MR. ORTIZ:

Q.   After -- well, how soon was the first seizure after you got -- about how long were you home --

A.   It was after he took a shower.

Q.   After he took a shower?

A.   After he took a shower.   We were inside the house, and he was trying to go to sleep, and then, you know -- because it wasn't normal, you know.   I know when someone is falling asleep and someone is, you know, just going out of it, and it looked to me that he was just, you know, fainting, yeah.

Q.   Okay.

A.   And that's when I started to wake him up.

C E R T I F I C A T E

STATE OF HAWAII                    )

                                  )   SS.

CITY AND COUNTY OF HONOLULU   )


        I, SHARON H. COSKEY, do hereby certify:

        That on July 14, 2017, at 9:14 a.m. appeared before me GILBERT G. RUIZ, the witness whose 179-page deposition is contained herein; that prior to being examined he was by me duly sworn or affirmed pursuant to Act 110 of the 2010 Session of the Hawaii State Legislature; that the deposition was taken down by me in machine shorthand and was thereafter reduced to typewritten form under my supervision; that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter; that pursuant to Rule 30(e) of the Hawaii Rules of Civil Procedure, a request for an opportunity to review and make changes to this transcript was made by the deponent or a party prior to the completion of the deposition.

        I further certify that I am not an attorney for any of the parties hereto, nor in any way concerned with the cause.

        DATED this 29th day of July, 2017, in Honolulu, Hawaii.


_____
SHARON H. COSKEY, CSR NO. 359