IN THE CIRCUIT COURT OF THE THIRD CIRCUIT

STATE OF HAWAII

```
------------------------------)
ASHLEY I. NARCISO,            ) Civil No.
Individually and as the       ) 16-1-126K (Kona)
Personal Representative of    ) (Other Non-Vehicle Tort)
THE ESTATE OF LAWRENCE S.     )
DEPONTE; SHANE DEPONTE,       )
                              )
          Plaintiffs,         )
                              )
     vs.                      )
                              )
SAARMAN CONSTRUCTION, LTD.;   )
JOHN DOES 1-10; JANE DOES     )
1-10; DOE CORPORATIONS        )
1-10; DOE PARTNERSHIPS        )
1-10; DOE NON-PROFIT          )
ENTITIES 1-10; and DOE        )
GOVERNMENTAL ENTITIES 1-10,   )
                              ) [Caption Continued
          Defendants.         )  On Next Page]
------------------------------)
```

DEPOSITION OF MONIQUE M. DEPONTE

Taken on behalf of the Defendant and Third-Party Plaintiff Saarman Construction, Ltd., at the Law Offices of Ian L. Mattoch, 65-1279 Kawaihae Road, Waimea, Hawaii, commencing at 1:22 p.m., on Friday, July 14, 2017, pursuant to Notice.

**EXHIBIT _F_**

BEFORE:      SHARON H. COSKEY, CSR NO. 359

Certified Shorthand Reporter

Ralph Rosenberg Court Reporters, Inc.
Ofc: (808)524-2090   courtreporters@hawaii.rr.com

```
---------------------------)
SAARMAN CONSTRUCTION, LTD.,)  [Caption Continuing]
                           )
          Third-Party      )
          Plaintiff,       )
                           )
     vs.                   )
                           )
OCEAN TILE, LLC; JOHN DOES )
1-10; JANE DOES 1-10; DOE  )
PARTNERSHIPS 1-10; DOE     )
CORPORATIONS 1-10; and DOE )
ENTITIES 1-10,             )
                           )
          Third-Party      )
          Defendants.      )
---------------------------)
```

APPEARANCES:


For Plaintiffs:

    DANIEL P. KIRLEY, ESQ.
    Law Offices of Ian L. Mattoch
    737 Bishop Street, Suite 1835
    Honolulu, Hawaii  96813


For Defendant and Third-Party Plaintiff Saarman
Construction, Ltd.:

    WESLEY H.H. CHING, ESQ.
    Fukunaga Matayoshi Ching & Kon-Herrera
    1200 Davies Pacific Center
    841 Bishop Street
    Honolulu, Hawaii  96813

    and

    JONATHAN L. ORTIZ, ESQ.
    Ortiz & Katano
    2121 Davies Pacific Center
    841 Bishop Street
    Honolulu, Hawaii  96813


For Third-Party Defendant Ocean Tile, LLC:

    LANCE S. AU, ESQ.
    Sumida Au & Wong, LLLC
    735 Bishop Street, Suite 411
    Honolulu, Hawaii  96813








                  -o0o-

I N D E X

EXAMINATION BY:                                        PAGE

        MR. CHING ...............................   5

        MR. KIRLEY ..............................   68

        MR. AU  .................................   84

        MR. CHING ...............................   86

-o0o-

INDEX OF EXHIBITS

                                                    PAGE

Exhibit 12:  Saarman/Ocean Tile Subcontract         17

    (S000244 - S000283)

Exhibit 13:  Lawrence DePonte Employee              31

    Questionnaire, Three Pages

Exhibit 14:  Color Xerox Photo                      43

Exhibit 15:  Certificate of Liability               53

    Insurance (S000470 and S000484)

-o0o-

(Disclosure Available for Counsel.)

MONIQUE M. DEPONTE,

having been first duly sworn,

testified upon her oath as follows:

DIRECT EXAMINATION

BY MR. CHING:

Q.    Please state your name for the record.

A.    Monique M., as in Mahealani, DePonte.

Q.    What's your residence address?

A.    Our physical address here in Waimea is 67-1279-B Mamalahoa Highway.

Q.    What's located there?

A.    What's located there?  Our home.

Q.    And that's you and Wallace?

A.    Correct, and my children, yes.

Q.    And your children.  So do you also reside on Maui?

A.    No.  We have a current business operations on Maui.

Q.    What's the principal location of your business, Ocean Tile, LLC?

A.    Our small storage shop and tiny, little office is located at 350 North Market Street.

Q.    That's right in Wailuku?

A.    Correct.

Q.    So have you had your deposition taken before in a civil case like this?

A.    No.

Q.    Let me go over the procedure.  So we will be asking you questions about the project and the accident involving Lawrence DePonte, and the most important thing is you understand any of the questions asked of you.

If you have any question or confusion about the question, let us know, and we will rephrase it or restate it.  Okay?

A.    Okay.

Q.    If you go ahead and answer the question, we will assume you understand the question.  Okay?

A.    Okay.

Q.    It's important that we speak at separate times.  I had a lot of trouble with Gil, but if you could let us finish our questions, we will let you finish your answers, and it will be a clean record.  All right?

A.    Correct.

Q.    We don't want you to guess about anything or speculate, but if you have a reasonable estimate about a time, date, distance, you can provide that to us, but just let us know it's an estimate.  All

right?

A.    Okay.

Q.    This is a relatively informal proceeding, but it's given with the same sanctity in terms of your being sworn to provide testimony under oath as if you were testifying in court.  Okay?

A.    Okay.

Q.    And if this matter were to proceed to trial and you testify differently or contradicted something you said at your deposition, it could be commented upon to the fact finder or to the court.

A.    Okay.

Q.    We also need verbal responses rather than just shaking your head or "uh-huh" or "un-un," because that's not very easy to transcribe for the court reporter, and we don't have a video machine here.

A.    Yes.

Q.    Okay?

A.    Yes.

Q.    Do you have any questions before we proceed?

A.    No, I do not.

Q.    Now, is there any reason you would not be able to give truthful, accurate testimony today, like

medication or, you know, your physical health?

A.    No.  No reason.

Q.    All right.  So, you know, if, again, if you have any questions about our questions, let us know, but we will proceed.

A.    Okay.

Q.    Were you involved in the -- well, what's your position with the company?

A.    I am co-owner with my husband, Wallace.

Q.    When was the company formed?

A.    We formed an LLC in March of 2010.

Q.    And that was formed as Ocean Tile, LLC?

A.    Yes.

Q.    What's your -- if I could ask you for some background information, what's your date of birth?

A.    My date of birth is

Q.    And were you born on Maui?  Big Island?

A.    Born here on the Big Island in Kailua-Kona, Kealakekua Hospital.

Q.    High school, where did you go to high school?

A.    Honokaa High School.

Q.    On the east side?

A.    Yes.

Q.    What year did you graduate?

Q.    How long did you do that?

A.    Up until 2009 or late -- yeah, late 2008, early 2009.

Q.    Did you become a journeyman?

A.    Yes, I did.

Q.    During that time period?

A.    Yes.  At the end of that '08 I received my journeyman card.

Q.    And you were union throughout that time period?

A.    Yes.

Q.    Working for BMK?

A.    Yes.

Q.    What did you do after that?

A.    Immediately after that -- I was already involved with my husband, Wallace, and we worked for maybe two companies on Maui, and we started operating under his license in 2009.

Q.    Was that different from -- his license being different from the Ocean Tile license?

A.    We were just still -- he was operating as a sole proprietor.  We hadn't really organized completely yet.  We just tried to test the waters. He's had his license for many years, so we just activated it.

Q.    What kind of license is that?

A.    A contractor's license.

Q.    But was it a C, specialty contractor?

A.    Yes, C license.

Q.    Do you remember what number?

A.    20942.

Q.    And what category is that?

A.    CT.  Ceramic tile, I believe.

Q.    Do you know when he first got his license?

A.    1996.

Q.    Was he ever the responsible managing employee for any of these companies?

A.    We are in the process of making him the RME for our company.

Q.    Ocean Tile?

A.    Correct.

Q.    Who is the -- who is the present RME?

A.    According -- I guess no one right now. There was a miscommunication about how to classify us in the licensing process, but.

Q.    He will be the R --

A.    He will be, correct.

Q.    And does Ocean Tile, LLC have the same license?

A.    Yes.

Q.   That is, a CT 20942 license?

A.   Yes.

Q.   And it's with Wallace to be the RME?

A.   Correct.

Q.   So what precipitated the formation of Ocean Tile, LLC?

A.   I just -- at that point we just figured that that was the correct way to operate a business. The most professional manner is to organize, be more formal.

Q.   And are you and Wallace the managing members?

A.   Yes.

Q.   Anybody else as a managing member?

A.   No.

Q.   Let's say in September 2015 when this accident occurred, how many employees did Ocean Tile, LLC have?

A.   We had, I believe, eight.  That fall was a very, very busy time, and we had a project here on this island and projects over on Maui as well.

Q.   Which projects on this island?

A.   The Mauna Lani Golf Villas.

Q.   The one that is the subject of the subcontract between Saarman and Ocean Tile, LLC?

A.    Correct.

Q.    And did you have anything else going on on the Big Island besides the -- what we will call the Golf Villas at Mauna Lani --

A.    No.

Q.    -- project?  Who were your employees on the Big Island in September 2015?

A.    We had Gilbert Ruiz and Lawrence DePonte. Pocho.

Q.    And then you had projects on Maui?

A.    Correct.

Q.    At that same time?

A.    Yes.

Q.    And did any of the workers on Maui come over to the Big Island to work on the Golf Villas project in the month of September 2015?

A.    No.

Q.    When did Ocean Tile first begin performing work on this subject project, the Golf Villas at Mauna Lani?  Do you know when?

A.    It was the beginning of 2015.  I think that building was "L" building.  We were maybe halfway through -- a little over halfway through the project at that point.

Q.    Actually, might it be the "I" building?

A.   Oh, "I," yes.

Q.   We will be referring to some exhibits that were previously marked at Mr. Ruiz's deposition.

A.   Okay.

Q.   And if there's markings on it, it might have been made by him, but Exhibit 1 was referred to earlier, and it's -- you will see that there's an arrow indicating -- a red arrow to what is referred to as the "I" building.  Does that refresh your recollection?

A.   Yes.  Thank you.

Q.   And was that approximately halfway through the project for what Ocean Tile was performing?

A.   Yes.

Q.   So going back to the subcontract, who was involved in the negotiations or the discussions that led to the contract between Saarman and Ocean Tile, LLC as between you and your husband?

A.   Just the two of us.  I would speak directly with the estimator at Saarman, and I would take that information and go over, converse/discuss with my husband.

Q.   Who was that estimator at Saarman?  Do you remember the name?

A.   I do not remember the person's name, no.

Q.    Was he in California or here?

A.    Yes, California.

Q.    And was this a bid subcontract?

A.    Yes.

MR. CHING:  Let me mark as the next exhibit in order the subcontract, Exhibit 12.

(Deposition Exhibit 12 marked.)

MR. ORTIZ:  Eleven?

MR. CHING:  Twelve.

MR. AU:  What is Exhibit 11?

MR. CHING:  EMS.

MR. ORTIZ:  EMT.

MR. CHING:  No, EMS.  I mean, yeah, that's what it's called, the EMS report.  I'm sorry. That was marked before.  Just confused about what number we're on.

BY MR. CHING:

Q.    So we're on number 12.  Do you recognize this?  And take a moment to look at it.  And the signature pages -- page is on a Bates stamp -- it's actually page 26 of the subcontract, but it's in the lower right-hand corner S000270.  Do you recognize your husband's signature?

A.    Yes, I do.

Q.    And does this document, and you're welcome

to look at it, appear to be the -- excuse me -- subcontract between Saarman and Ocean Tile, LLC for the AOA Golf Villas at Mauna Lani Resort project?

A.    It appears to be, yes.

Q.    There's various Exhibits A through F at the end of it.  Do you see those?

A.    Yes, I see them.

Q.    So who between you and your husband was more involved in discussions leading to the execution of the contract?

A.    Me.

Q.    Did you review the contract or subcontract, you know, prior to your husband signing it?

A.    Yes.

Q.    And does this Exhibit 12 appear to accurately reflect the subcontract entered into between Saarman and Ocean Tile, LLC?

A.    Yes.

Q.    Are you familiar with the indemnity provisions that are contained in the contract?

A.    I only have basic knowledge.

Q.    For example, and I don't necessarily mean a legal understanding in terms of a lawyer or a judge or a court, but Article 9 on page 14, Bates stamped S000258, do you have that in front of you?

A.    I do.

Q.    Okay.  And you'll see that there's "Indemnification" as the title to that Article 9.  Do you see that?

A.    I see that.

Q.    Do you understand that under the subcontract, the subcontractor agreed to indemnify defendant, hold harmless owner and contractor from any and all claims, demands, causes of action, damages, costs, expenses arising out of or in connection with subcontractor's operation and/or performance under this subcontract?

MR. AU:  I'll object you're asking for her to give a legal conclusion.

BY MR. CHING:

Q.    You see that that's what it says?

A.    I see that.

Q.    And that's in paragraph 9.1.  And then on paragraph 9.1.1 is a reference to personal injury, to death to persons, including, but not limited to any employees of the subcontractor, caused or alleged to be caused in whole or in part by any negligent act or omission of subcontractor or anyone directly or indirectly employed by subcontractor, regardless of whether such personal injury or damage is caused by

an indemnitee.  Do you see that?  That's what it says at --

A.   I see that.

Q.   -- paragraph 9.1.1.  So Lawrence DePonte was an employee of Ocean Tile, LLC when this accident occurred?

A.   Yes.

Q.   And he was performing work in the course and scope of his employment for Ocean Tile, LLC?

A.   Yes.

Q.   Was a worker's compensation claim filed for him?

A.   To my understanding, yes.

Q.   Who was the work comp carrier for Ocean Tile at that time?

A.   State Farm.

Q.   Do you know whether State Farm accepted the worker's compensation claim and provided benefits to the family?

A.   To my memory, yes.

Q.   Could you turn to Article 5 which is on page 4, S000248.  So this Article 5 provides for indemnification where the subcontractor uses equipment of the contractor.

In terms of the accident, what's your

understanding as to whose equipment the scaffold that was outside Unit I-1, you know, where the accident occurred, whose scaffold that was?

MR. AU: I'm going to object to the compound question. It may call for a legal conclusion.

MR. CHING: Let me rephrase the question.

BY MR. CHING:

Q. Referring to the -- this is Exhibit 2 that was marked at Mr. Ruiz's deposition, and in red, outside Unit I-1, someone has drawn a red rectangle with the word "Scaffold Approximate," and then below that "Gilbert Stated Lawrence Fell Here," and there is another arrow towards the middle of the mauka side of the scaffold. Do you see that?

A. I see that.

Q. So the scaffold that was outside Unit I-1 which -- your understanding, I realize you weren't an eyewitness there, but your understanding was that Lawrence fell from a scaffold, correct?

A. Correct.

Q. Outside Unit I-1?

A. (Nodding head.)

Q. And so if any of the information I show you

is different from what you understand, can you let us know?

A.   I will.

Q.   All right.  So do you have an understanding as to whose scaffold that was?

A.   Yes.  That belonged to Saarman Construction.

Q.   And did you understand that your company, Ocean Tile, LLC, and its employees were using that scaffold the day of the accident?

A.   Yes.

Q.   And did you ever -- before or after signing the contract or having your husband sign the contract -- look to see whether there was any obligations of Ocean Tile, LLC in connection with its use of the equipment of Saarman when an accident occurs?

MR. AU:  I'm going to object.  Calls for a legal conclusion.  Tell my client not to answer.  I'm instructing you not to answer.

MR. CHING:  What's the basis of the instruction?

MR. AU:  You're asking her for her legal obligation --

MR. CHING:  No.

Q.    And you do see that Article 5 concerns the subject of subcontractor using contractor's equipment, materials, labor, supplies, or facilities? You see that at Section 5.1.3?

A.    I see that now, yes.

Q.    And do you see at the end of the paragraph that subcontractor accepts any and all of contractor's equipment, materials, labor, supplies, or facilities as furnished?  You see that?

A.    I see that.

Q.    Now, I assume you're not intimately knowledgeable about indemnity obligations under a subcontract.

A.    No.

Q.    So I'm not going to ask you legal opinions, but what I do want to ask you is with respect to the scaffold that was erected there outside Unit I-1, do you know whether your company, meaning your workers, inspected that scaffold or checked it out at any time on the days before this accident?

A.    To my understanding, every one of our employees, including my husband, checked it every single day that they used it.

Q.    Your husband was present on the Big Island?

A.    Not at that time.

Q.    Well, let me just tell you what Mr. Ruiz testified to in terms of the time period.

His recollection -- from this morning, at least -- is that he and Lawrence started at that Building "I" that Monday, September 14, 2015, and the accident occurred --

A.    Wednesday.

Q.    -- Wednesday, September 16, 2015.  Is that consistent with your recollection or different in terms of when your crew started work on that building?

A.    I can't remember if they -- no.  That is correct, yes.

Q.    Now, I'm a little confused, because you said that your company actually had done a number of buildings before, earlier that year, right?

A.    Correct.

Q.    But was either Lawrence or Gilbert Ruiz involved in those buildings -- those prior buildings?

A.    Yes, but at this time I cannot tell you exactly which one.  At that time in September we were living in Maui, based out of Maui, and commuting to this project.

Q.    But do you recall whether, let's start with Lawrence DePonte, whether this Building "I" was the

first building that he worked on for Ocean --

A.    No --

Q.    -- Tile?

A.    -- no, it was not.

Q.    Do you remember how many buildings he had worked on before?

A.    I do not remember.

Q.    Were they all similar in terms of, you know, the kind of work that was going to be performed for the lanais, that is, retiling the lanais --

A.    Yes.

Q.    -- for the upstairs units?

A.    The scope of work was identical to all of them.  The only thing that changed were the dimensions.

Q.    And do you remember how many buildings he had worked on before?

A.    I do not remember.

Q.    Now, how about Mr. Ruiz, he seemed to indicate this morning that this was his first week on the job for Ocean Tile, LLC.  Is that consistent with your recollection or different?

A.    I do not remember.

Q.    So you mentioned a few moments ago that you think Wallace would have checked out the scaffolding

for Building "I," or was I confused about that?

A.    If he was on the project, then he would have checked it.

Q.    But do you know whether he was present when Building "I" was being worked on -- present on island?

A.    No.  Wallace was with me on Maui working.

Q.    So do you know what was done by Lawrence and/or Gilbert to inspect and check out the scaffolding before they started work at Building "I"?

A.    I was communicated by my husband that Lawrence did the visual check, as he was instructed by Wallace, in the same way Wallace did it.  He reminded his brother "You do the same thing," and, to my understanding, Lawrence did do it.

Q.    Lawrence is Wallace's brother?

A.    Yes.

Q.    And I'm trying to keep all of the family straight, because Patrick is your father?

A.    Uh-huh.

Q.    Is that a yes?

A.    Yes.  Sorry.

Q.    So I apologize if I get the relationships wrong.

A.    That's okay.

Q.   But, anyway, so do you -- is it your understanding that Wallace communicated with Lawrence before the accident that Lawrence had checked on the scaffolding?

A.   Yes.

Q.   And was there any written record of that, to your knowledge?

A.   No.

Q.   Would this have been a verbal communication between Lawrence here on the Big Island and Wallace on Maui?

A.   Yes.

Q.   And was that something that was customary or a standard practice for Lawrence to do when he got to another building on this project and there was another scaffold there to use for his work on the second floor lanais?

A.   Yes.  It's a -- it was required to check every single morning.

Q.   Every single morning of --

A.   Each time --

Q.   -- work activity?

A.   Correct, yes.  Each time they started the day, do your visual check.

Q.   So if Mr. Ruiz is correct about that being

their third day at Building "I," it would have been checked by Lawrence on Monday morning, Tuesday morning, and Wednesday morning, September 14, 15, and 16, 2015?

A.    Correct.

Q.    Now, can you explain a little bit the experience of Lawrence DePonte as a person engaged in tile work?  Was he a journeyman?

A.    Yes.  He was a long-time journeyman, worked in and out of the union alongside his brother Wallace for over 25 years.

Q.    So Lawrence and Wallace were long-time -- decades in the industry of tile work?

A.    Yes.

Q.    How long had Lawrence worked for Ocean Tile, LLC?

A.    I believe his date of hire was in April.

Q.    Of 2015?

A.    Correct.  Yes.

Q.    Was it specifically for this project, the reason that he was hired?

A.    Yes.

Q.    And was all his work that he performed -- that is, Lawrence -- for Ocean Tile, LLC in connection with this project, the Golf Villas at

background and experience in tile work in the construction industry?

A.   Gilbert is a skilled -- he's skilled in his trade.  To my understanding, they had a fencing business.  So he's knowledgeable of job site safety.  He is knowledgeable of basic working principles, measuring tape, basic equipment, and safety.  That's my understanding of Gilbert's background.

Q.   What was his role in connection with the work that was going to be performed at the Golf Villas?

A.   He was to be helper; to be stationed on the ground.

Q.   For Lawrence?

A.   For Lawrence, yes.

Q.   Would you have expected him to perform any inspection of the scaffolding?

A.   I expected everybody who used the scaffolding to visually look at it and to report to whoever was the lead on that day, at that time.

I don't -- I didn't expect Gilbert to be responsible, but if -- to -- I expected everybody to look at it, yes.

Q.   And if they saw a problem, they would -- you would expect them to report it?

A.    Yes.

Q.    But as far as the person with the responsibility to do the inspection in the morning, that would have been Lawrence?

A.    Correct.

Q.    So what kind of background did Lawrence have on scaffolding?  Did he have OSHA training on scaffolding?

A.    Yes, he did.  As I mentioned, he's been in the union for a long time, and being in the union on Oahu, they've done countless commercial projects, and he did and has had OSHA training throughout his career.

Q.    Do you know if he had a current certificate for -- from OSHA for scaffold training?

A.    I do not know if he had a current certificate at that time from the union.

Q.    Either by OSHA, HIOSH, the union, or any of the safety companies that provide those kinds of training certifications, do you know if he had any?  That is Lawrence.

A.    Did he have one at that time --

Q.    Yes.

A.    -- or had he throughout his career?

Q.    At the time that he was performing work at

knocked out of him. His shoulder is sore. He said he's okay. He's at Gilbert's house." And that was early in the afternoon.

Q. Do you know when your husband first found out about the accident?

A. I think maybe lunchtime, and that's about it. I don't -- I don't think that they called him and told him right away, because Poch just isn't like that. He's humble. He asked that he didn't want to make a problem for anybody.

Q. So Mr. Ruiz this morning said that the accident occurred around 10:30 a.m. and that they resumed work for -- well, they took a break for a while, then resumed work shortly and then stopped work and then drove to his house and got to his house around 11:30 and sometime after that called your husband. Does that sound about right?

A. Yes.

Q. And what were the Ocean Tile company procedures when a job site accident occurs -- in terms of reporting it?

A. It's a standard to -- to report it to us first, and then for us to make communication with the general contractor -- and, unfortunately, it would be after the fact -- but notify them that this incident

did happen.

Q.    And is it your understanding that neither Lawrence nor Gilbert Ruiz notified the general contractor at the site that day about this accident?

A.    That's my understanding.

Q.    Who ultimately notified the general contractor about this accident?

A.    Me.

Q.    When?

A.    Later that evening, after we found out Poch had passed away.  I think I called my dad first, and I contacted Jaime several times until he called me back.  Probably been after 6:00 or 7:00 or something.

Q.    And do you know if Jaime was in the Mainland --

A.    No.

Q.    -- or here?

A.    No.  Jaime was --

Q.    That's right.  He was here at the time?

A.    Yeah.  Jaime was there.

Q.    So you had a cell number for him?

A.    Yes.

Q.    And your dad being Patrick?

A.    Yes.

Q.    So when you say sometime in the evening,

A.   Yes.

Q.   -- immediately?

A.   Yes.

Q.   Had there been any prior job site accidents at this job before this one --

A.   Never.

Q.   -- for Ocean Tile?

A.   Never.  Ocean Tile has never had an accident or incident on any job site prior to this.

Q.   This is the first --

A.   Yes.

Q.   -- job site accident --

A.   Yes.

Q.   -- that Ocean Tile had --

A.   Yes.

Q.   -- involving an employee of Ocean Tile?

A.   Yes.  Involving anybody.

Q.   So one of the other things I wanted to ask you about, on Exhibit 12, the contract, if you could turn to the second-to-the-last page of the document, which is Bates stamped S000282, and this has to do with the minimum limits of insurance, part of Exhibit F, the insurance requirements for the subcontractor, each subcontractor, it refers to commercial general liability insurance with $1 million per occurrence,

and that's at paragraph 2-A.  Do you see that?

A.    Uh-huh.

Q.    Is that a yes?

A.    Yes.  I'm sorry.

Q.    And then at paragraph 2-E, "Subcontractor Excess or Umbrella Liability," $1 million per occurrence, so let me mark as the next exhibit in order the certificate of liability insurance forms that were provided by Ocean Tile to Saarman, Exhibit 15.

So what the first page appears to show is a $1-million-per-occurrence commercial general liability policy issued by State Farm.  Do you see that?

(Deposition Exhibit 15 marked.)

A.    I see that.

Q.    And then the second page has the -- well, excuse me.

The lower -- below that is, at the very bottom, is the worker's compensation and employer's liability coverage.  Do you see that?

A.    I do.

Q.    And that's by State Farm as well?

A.    Yes.

Q.    Which is what you mentioned earlier?

A.   Yes.

Q.   And then the next page is the automobile liability coverage by State Farm, but my question is do you know if Ocean Tile obtained the subcontractor excess or umbrella liability insurance for this job, under this contract?

A.   To my understanding, yes.

Q.   Do you know who that would have been with?

A.   State Farm.

Q.   What do you base that understanding on?

A.   Saarman Construction was very, very, very strict about the insurance, and they required an abundance of what they were calling endorsements, something that even my agent at State Farm was unfamiliar with.

So the certification for insurance process took a lot longer than a usual process does, and she spent a lot of time making sure that she was able to meet all of their insurance requirements.

Q.   The insurance requirements reflected in Exhibit F of Exhibit 12?

A.   Which page is that again?

Q.   The page right before.   S000281.

A.   Yes, to my understanding.

Q.   In other words, Exhibit F is a --

C E R T I F I C A T E

STATE OF HAWAII                    )

                                  )   SS.

CITY AND COUNTY OF HONOLULU   )


            I, SHARON H. COSKEY, do hereby certify:

            That on July 14, 2017, at 1:22 p.m. appeared before me MONIQUE M. DEPONTE, the witness whose 90-page deposition is contained herein; that prior to being examined she was by me duly sworn or affirmed pursuant to Act 110 of the 2010 Session of the Hawaii State Legislature; that the deposition was taken down by me in machine shorthand and was thereafter reduced to typewritten form under my supervision; that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter; that pursuant to Rule 30(e) of the Hawaii Rules of Civil Procedure, a request for an opportunity to review and make changes to this transcript was made by the deponent or a party prior to the completion of the deposition.

            I further certify that I am not an attorney for any of the parties hereto, nor in any way concerned with the cause.

            DATED this 30th day of July, 2017, in Honolulu, Hawaii.


_____
SHARON H. COSKEY, CSR NO. 359